## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO.

AMETEK, INC.,

                Plaintiff,

    v.

RICARDO LINARES, GRETA HERRERA,
EDUARDO RODRIGUEZ, and AVIATION
CONCEPTS MRO, LLC,

          Defendants.

### VERIFIED COMPLAINT

Plaintiff AMETEK, Inc. ("AMETEK") files the following Verified Complaint against Ricardo Linares, Greta Herrera, Eduardo Rodriguez, and Aviation Concepts MRO, LLC ("Aviation Concepts") (collectively "Defendants"). In support hereof, AMETEK states as follows:

### NATURE OF THIS ACTION

1.    AMETEK is a global designer and manufacturer of electronic instruments and electromechanical devices for the energy, aerospace, power, research, medical, and industrial markets.

2.    Prior to April, 2024, Linares held the position of Business and Technical Manager, Avtech at AMETEK—a critical role within AMETEK in which he gained knowledge of an array of AMETEK's confidential, proprietary, and trade secret information.

3.    Herrera and Rodriguez held similarly important roles within AMETEK before their departures in October 2023 and March 2024 (respectively) and likewise had access to a variety of AMETEK's confidential, proprietary, and trade secret information.

4.      In light of his pivotal role at AMETEK and in conjunction with the sale of the Avtech business to AMETEK, Linares executed an Employment Agreement ("the Employment Agreement") under which he agreed, among other things, to (1) a confidentiality clause prohibiting him from disclosing AMETEK's confidential, proprietary, and trade secret information; and (2) a non-competition clause restricting him from working for an AMETEK competitor for twelve (12) months following the end of his employment.

5.      A true and correct copy of the Employment Agreement is attached as ***Exhibit A***.

6.      A true and correct copy of the Third Modification to Employment Agreement, which extended the agreement through March 31, 2024, is attached as ***Exhibit B***.

7.      Following his separation from employment, AMETEK retained Linares as a consultant, and he executed a Consultancy Agreement ("the Consultancy Agreement") under which he similarly agreed to (1) a confidentiality clause prohibiting him from disclosing AMETEK's confidential, proprietary, and trade secret information; and (2) a non-competition clause restricting him from working for an AMETEK competitor during the term of his consultancy.

8.      A true and correct copy of the Consultancy Agreement is attached as ***Exhibit C***.

9.      This action stems from Linares's disregard for, and breach of, his post-employment obligations under the Employment Agreement and the Consultancy Agreement (together, "the Agreements") through his misappropriation of AMETEK's confidential, proprietary, and trade secret information, his work for Aviation Concepts, a direct competitor of AMETEK, and Linares, Herrera, and Rodriguez's efforts to use AMETEK's misappropriated information to provide an unfair competitive advantage to Aviation Concepts.

10.    AMETEK brings this action to prevent immediate and irreparable harm to it resulting from Defendants' unlawful actions.

## PARTIES

11.    Plaintiff AMETEK, Inc. is a Delaware corporation with a principal place of business located in Berwyn, Pennsylvania.

12.    Defendant Ricardo Linares is an adult individual and resident of the state of Florida.

13.    Defendant Greta Herrera is an adult individual and resident of the state of Florida.

14.    Defendant Eduardo Rodriguez is an adult individual and resident of the state of Florida.

15.    Defendant Aviation Concepts is a Limited Liability Company organized under Florida law, and its sole member and registered agent is Dean Wood, an adult individual and resident of the state of Florida.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1332(a) because AMETEK and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

17.    This Court also has jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1331 and § 1367 because AMETEK raises a claim under a federal statute, the Defend Trade Secrets Act (DTSA), and AMETEK's other state law claims arise out of the same nucleus of operative facts as its claim under the DTSA (i.e., Defendants' unlawful competition with AMETEK using AMETEK's trade secret information).

18.    This Court has personal jurisdiction over Linares, Herrera, and Rodriguez because they are residents of the State of Florida.

19.     This Court has personal jurisdiction over Aviation Concepts because it is physically located in Florida and its sole member and registered agent is a Florida resident.

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the harm from Defendants' unlawful actions occurred in this venue, where AMETEK and Aviation Concepts both conduct business, and because Linares, Herrera, and Rodriguez worked in Florida for AMETEK.

## FACTUAL BACKGROUND

**I.      Linares, Herrera, and Rodriguez's Employment with AMETEK and Access to the Company's Confidential Information.**

21.     Headquartered in Berwyn, Pennsylvania, AMETEK is a global designer and manufacturer of electronic instruments and electromechanical devices for the energy, aerospace, power, research, medical, and industrial markets.

22.     In November 2012, in connection with AMETEK's acquisition of Avtech Avionics and Instruments, LLC ("Avtech")—a major investment in exchange for substantial consideration—AMETEK hired Linares, the former owner of Avtech, as Business and Technical Manager.

23.     As a result of the acquisition, Avtech became part AMETEK's Maintenance, Repair, and Overhaul (MRO) Division, and Linares entered into his Employment Agreement with AMETEK as Avtech's Business and Technical Manager.

24.     In his role as Business and Technical Manager, Linares played a pivotal part in AMETEK's development of the newly acquired Avtech business and became intimately familiar with all aspects of that business and its customers, including customers throughout the United States and in Europe.

25.     AMETEK entrusted Linares with maintaining relationships with some of its most crucial customers, including relationships representing millions of dollars in annual revenue for AMETEK.

26.     AMETEK employed Herrera from the time AMETEK acquired Avtech in 2012 until October 2023, most recently in the role of Quality Systems Manager.

27.     In that position, Herrera reviewed and authorized thousands of quality control documents required for repaired parts to be used on aircrafts, thereby gaining intimate knowledge with multiple important aspects of AMETEK's business.

28.     AMETEK employed Eduardo Rodriguez in the role of Lead Engineer, ATE and Avionics Maintenance from the time AMETEK acquired Avtech in 2012 until March 29, 2024.

29.     In that role, Rodriguez managed production flow, directed technicians, and gained expertise in an array of machines that are vital to production at AMETEK.

30.     During their employment with AMETEK, Linares, Herrera, and Rodriguez were all given access to, and used in performing their job duties, AMETEK's confidential, proprietary, and trade secret information.

31.     The aforementioned confidential, proprietary, and trade secret information includes, among other things, all of AMETEK's customers, customer needs and preferences, detailed customer and vendor pricing information, operating procedures, including techniques, processes, procedures, and formulations, business plans and strategies, and detailed information about the Company's finances (including margins, profits, losses, etc.).

32.     This information is not generally known to the public or readily ascertainable by legitimate means.

33.     This information is also related to AMETEK's products and services used in interstate commerce.

34.     As such, any competitor of AMETEK given access to this information could easily exploit that information to gain an unfair competitive advantage over AMETEK.

35.     AMETEK has implemented safeguards to maintain the confidentiality of this information, including storing its confidential information on a secure server, password-protecting access to databases that contain such information, and limiting access to confidential information to only those employees with a specific need for such information.

36.     AMETEK also requires certain employees who may be privy to a substantial amount of its confidential information to execute agreements containing restrictive covenants designed to protect the Company against disclosure of such information to competitors.

37.     AMETEK also maintains policies prohibiting employees from using confidential information learned or obtained during their employment with AMETEK for any purpose other than performing their job duties at the Company.

## II.     Linares's Employment Agreement with AMETEK.

38.     As a condition of and in conjunction with his employment with AMETEK, Linares executed the Employment Agreement on November 7, 2012. (*See* Exhibit A).

39.     The original Employment Agreement was for a term of three years, and the parties extended it several times. The most recent, and final, Third Modification to Employment Agreement, was effective as of July 1, 2023, with a Termination Date of March 31, 2024. (*See* Exhibit B).

40.     Regarding AMETEK's confidential, proprietary, and trade secret information, Linares acknowledged as follows:

The Executive acknowledges that he will, in the course of, or incident to, his employment by the Corporation, obtain from the Corporation various confidential and proprietary information of the Corporation and/or its current or future parents, subsidiaries or affiliates (referred to herein as "Proprietary Information"). The Executive acknowledges that the Corporation has taken and is taking all reasonable measures to protect its legitimate interests in the Proprietary Information, including but not limited to affirmative actions to safeguard the confidentiality of such Proprietary Information, and that the Corporation's Proprietary Information constitutes a unique and valuable asset of the Corporation and represents a substantial investment of time and expense by the Corporation, and that any disclosure or use of any Proprietary Information other than for the sole benefit of the Corporation would be wrongful and would cause irreparable harm to the Corporation.

(*Id.* at ¶ 10(a)).

41.     To that end, Linares also acknowledged as follows:

The Executive acknowledges that, as between the Corporation and the Executive, all Proprietary Information is and shall remain the exclusive property of the Corporation. The Executive acknowledges that he is being provided access to the Proprietary Information, and that such access is intended solely to enable the Executive to successfully perform the duties of his employment with the Corporation, and that the preservation of the confidentiality of such Proprietary Information is necessary to the Corporation's ability to accomplish its objectives and compete with its competitors.

(*Id.* at ¶ 10(b)).

42.     Given the importance of this confidential, proprietary, and trade secret information to AMETEK, Linares agreed to the following confidentiality clause:

The Executive agrees that he will hold all Proprietary Information in the strictest confidence, and that he will not disclose, communicate, or divulge the same to, or use the same for the direct or indirect benefit of, any person or entity other than the Corporation, in any manner or at any time either during or after his employment with the Corporation, regardless of the circumstances of his termination of employment with the Corporation. The Executive agrees to take all reasonable precautions to protect from loss or disclosure all Proprietary Information supplied to him by the Corporation or otherwise learned or accessed by the Executive. The Executive further assigns to the Corporation any rights he may have or acquire in any Proprietary Information and acknowledges that all Proprietary Information shall be the sole property of the Corporation and its successors or assigns. The Executive agrees that his obligations under this Agreement are in addition to any obligations the Executive has under any federal, state or other law, including but not limited to laws protecting confidential information and/or trade secrets.

(*Id.* at ¶ 10(c)).

43.     The Employment Agreement defined the confidential, proprietary, and trade secret

information covered by these clause as follows:

> The term "Proprietary Information" shall mean any and all confidential and/or proprietary
> knowledge, data or information of the Corporation and its current or future parents,
> subsidiaries and affiliates, without limitation, in any form whatsoever and whether or not
> specifically designated as confidential or proprietary, By way of illustration and not
> limitation, Proprietary Information includes, but is not limited to, information not generally
> available to the public through lawful means relating to Corporation's business, products
> and services; trade secrets; developments, inventions, patents, patent materials,
> copyrightable subject matter and ideas and other works of authorship; data, ideas,
> processes, methods, formulas, specifications, know-how, designs, improvements,
> discoveries, devices, techniques and research activity; computer systems, codes, and
> software, firmware or hardware programs; marketing and sales strategies or research;
> product plans or information; pricing strategies and techniques; long and short term
> business plans; existing and prospective market, client, vendor, and employee lists,
> contacts, and information; budgets; financial information; margin information; vendor or
> supplier information, including product sources, product availability, and price and cost
> information; operating procedures, including techniques, processes, procedures, and
> formulations; personnel information, including, without limitation, skills and
> compensation information; customer information, including customer identity, customer
> lists, contact persons, customer needs and preferences; information regarding distributors,
> joint venturers and other persons and entities with whom Corporation does business;
> information concerning specialized business methods and techniques; any information
> and/or applications relating to Corporation's internal information systems; and any other
> information concerning the business of Corporation which is not already known to the
> general public. Notwithstanding the foregoing, the Executive understands that he is free to
> use information that is generally available to the public or that is not gained or used as
> result of a breach of this Agreement or any other agreement to which the Executive may
> be a party.

(*Id.* at ¶ 10(d)).

44.     Because his role at AMETEK would also give him access to critical relationships

between AMETEK and its customers, product suppliers, and others, Linares also acknowledged

as follows:

> The Executive acknowledges that he will, in the course of, or incident to, his employment
> by the Corporation develop personal and professional relationships with the Corporation's
> customers, product suppliers, business associates, and personnel which are uniquely
> valuable to Corporation by virtue of Executive's particular position and skills. The
> relationships which the Executive has developed and will develop in connection with his
> employment with the Corporation are irreplaceable and extremely valuable to the

Corporation. The Executive further acknowledges that by virtue of his particular position with the Corporation he will be intimately involved with and uniquely significant to the development of the Corporation's good will in the market, which also is irreplaceable and extremely valuable to the Corporation.

(*Id.* at ¶ 13(a)).

45.     Accordingly, Linares agreed to the following non-competition clause, as amended by the Third Modified Employment Agreement:

In exchange for the valuable considerations included in this Agreement, at all times during the Executive's employment with the Corporation, and for a period of 12 months following the Executive's termination of employment with the Corporation for any reason, Executive shall not, on his own behalf or on behalf of any other person, firm, partnership, organization, agency, corporation or other entity, without the Corporation's express written consent, directly or indirectly:

(i) Own ( other than as a holder of securities listed on a recognized stock exchange provided that such holding shall not exceed five per cent of the class of securities of which the said holding forms part), manage, operate, join, work for, assist, render services to, or contribute knowledge to any Competitive Entity as an employee, principal, partner, director, officer, agent, owner, contract worker, independent contractor, consultant or otherwise, with or without compensation, in any geographic area in which, in the 18 months prior to the termination of the Executive's employment with the Corporation, Ametek's Maintenance, Repair, and Overhaul Division (the "Division") has conducted business, marketed or sold its products (whether directly or indirectly).

(ii) Contact, solicit, seek to do business with, or accept business in competition with the Division from any Customer or Prospective Customer of the Division as to whom (a) the Executive has had any contact or has solicited on the Division's behalf at any time in the 18 months preceding the cessation of Executive's employment; (b) the Executive has supervised any Division employee(s) who have had any contact or have solicited on the Division's behalf at any time in the 18 months preceding the cessation of Executive's employment; or (c) the Executive has had access to any Proprietary Information about the Customer or Prospective Customer.

(iii) Interfere in any way with the Division's business relationships with any Customer or Prospective Customer of the Division in the 18 months prior to the termination of the Executive's employment with the Corporation or with respect to which Executive had access to any Proprietary Information.

(iv) Except on behalf of the Corporation, solicit or in any way contact any of the Division's component product suppliers in an attempt to obtain component products of the same type purchased by the Division, or being planned for purchase by the Division during

Executive's employment, or in any way interfere with the Division's business relationships with those suppliers.

(*Id.* at ¶ 13(b); Exhibit B at ¶ 6).

46.    The Employment Agreement defines "Competitive Entity" as "any person, firm, partnership, corporation, agency or other entity or organization involved in the design, development, manufacture, and/or sale of products or services that compete with any product or service sold, marketed or offered by the [AMETEK MRO] Division; which perform the same or substantially similar function(s) as any product sold, marketed or offered by the Division; or which could be used as an alternative to, or replacement for, any product sold, marketed or offered by the Division." (*Id.* at ¶ 13(c)).

47.    The Employment Agreement is clear that the obligations detailed above "shall survive the cessation of [Linares's] employment…" (*Id.* at ¶ 16).

48.    By executing the Agreement, Linares acknowledged that if he violated any of the restrictive covenants therein, AMETEK "will suffer irreparable damage…for which money damages could not reasonably or adequately compensate" AMETEK. (*Id.* at ¶ 20).

49.    For that reason, Linares agreed that AMETEK "shall be entitled as a matter of right to injunctive or other equitable relief…to secure enforcement" of the restrictive covenants in the Employment Agreement and "consent[ed] to the issuance of injunctive relief, without the necessity of [AMETEK] posting a bond." (*Id.*).

50.    The Employment Agreement expressly provides that it is to be construed and interpreted under Pennsylvania law. (*Id.* at ¶ 28).

### III.    Linares's Consultancy Agreement with AMETEK.

51.    On March 31, 2024, Linares' Employment Agreement terminated, consistent with its terms.

52.     Immediately following his separation from AMETEK, AMETEK engaged Linares as a consultant.

53.     In connection with Linares' consultancy, he executed a Consultancy Agreement with AMETEK on April 22, 2024. (*See* Exhibit C).

54.     Because Linares' consultancy involved much of the same, critical work with AMETEK that he performed during his employment, the Consultancy Agreement contains similar restrictive covenant provisions. (*See id.*).

55.     For instance, Linares agreed to nondisclosure of AMETEK's confidential, proprietary, and trade secret information, defined in the Consultancy Agreement as follows:

> In this Agreement the term "Confidential Information" shall mean the Work Product, the existence of this Agreement and the relationship between the Parties, and any and all information relating to a party's business, including, but not limited to, research, developments, product plans, products, services, diagrams, formulae, processes, techniques, technology, firmware, software, know-how, designs, ideas, discoveries, inventions, improvements, copyrights, trademarks, trade secrets, customers, suppliers, employees, markets, marketing, pricing, finances disclosed by a party ("Discloser") either directly or indirectly in writing, orally or visually, to the other party ("Recipient") …

(*Id.* at ¶ 5(a)).

56.     Linares agreed to the following nondisclosure clause:

> Unless otherwise agreed to in advance and in writing, by Discloser, Recipient will not, except as required by law in accordance with Article 5(d) below, use the Confidential Information for any purpose whatsoever other than the performance of the Services or disclose the Confidential Information to any third party except vendors, partners, or subcontractors provided that such party: (i) is providing products or Services in connection with this Agreement; (ii) has a need to know the information; and (iii) is required to maintain the confidentiality of such information on terms no less stringent than those contained in this Section. Recipient shall remain liable for breach of this Section 5 by any such vendors, partners or subcontractors. Recipient shall use the same degree of care to avoid disclosure of the Confidential Information as it employs with respect to its own Confidential Information of like importance, but not less than a reasonable degree of care.

(*Id.* at ¶ 5(b)).

57.     Linares also agreed to the following non-competition clause:

During the Consultancy Period, Consultant will engage in no business or other activities which are, directly or indirectly, competitive with the business activities of the Company without obtaining the prior written consent of the Company.

(*Id.* at ¶ 6(a)).

58.     Similarly, Linares agreed to the following non-solicitation clause:

Consultant agrees that for a period of one (1) year after the earlier expiration or termination of this Agreement, Consultant shall not: (i) divert or attempt to divert from the Company any business of any kind in which it is engaged, including, without limitation, the solicitation of or interference ,with any of its suppliers or customers, or (ii) employ, solicit for employment, or recommend for employment any person employed by the Company during the Consultancy Period and for a period of one (1) year thereafter.

(*Id.* at ¶ 6(b)).

59.     Linares acknowledged that any breach of these restrictive covenants "would cause immediate and irreparable harm to [AMETEK] for which money damages would be inadequate" and therefore that AMETEK would "be entitled to injunctive relief…without proof of actual damages and without the posting of bond or other security" in the event of his breach of any of those provisions. (*Id.* at ¶ 17).

60.     Like the Employment Agreement, the Consultancy Agreement expressly states that it is governed by Pennsylvania law. (*Id.* at ¶ 18).

**IV.     Herrera and Rodriguez's Confidentiality Agreements with AMETEK.**

61.     On May 22, 2018, as a condition of her continued employment with AMETEK, Herrera executed a Confidentiality Agreement with AMETEK ("the Herrera Confidentiality Agreement").A true and correct copy of the Herrera Confidentiality Agreement is attached as *Exhibit D*.

62.     That same day, Rodriguez executed an effectively identical Confidentiality Agreement as a condition of his continued employment with AMETEK ("the Rodriguez

Confidentiality Agreement") (together with the Herrera Confidentiality Agreement, "the Confidentiality Agreements").

63.     A true and correct copy of the Rodriguez Confidentiality Agreement is attached as *Exhibit E*.

64.     Because their roles at AMETEK gave them both access to an array of the Company's confidential, proprietary, and trade secret information, both Herrera and Rodriguez agreed by executing the Confidentiality Agreements that they would "keep secret all Confidential Information [of AMETEK] …and will not use such Confidential Information other than for the Company's benefit" and that they would "not disclose Confidential Information to anyone outside of the Company, either during or after [their] employment, except with the Company's written consent." (Exhibit D, ¶ 1; Exhibit E, ¶ 1).

65.     The Confidentiality Agreements define "Confidential Information" as follows:

> "[A]ny information which, in whole or in part, concerns the Company's sales, sales volume, any other financial information, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel in the employ of customers and prospective customers, amount or kind of customer's purchases from the Company, the Company's sources of supply, the Company's computer programs, systems documentation, special hardware, product hardware, related software development, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, and inventions, and other confidential or proprietary information belonging to the Company or relating to the Company's affairs.

(Exhibit D, ¶ 3; Exhibit E, ¶ 3).

66.     The Confidentiality Agreements also provide that if either Herrera or Rodriguez breach these agreements, that AMETEK shall be entitled to institute legal proceedings to obtain, among other things, damages and injunctive relief against them. (Exhibit D, ¶ 5; Exhibit E, ¶ 5).

V.     **Linares Misappropriates AMETEK's Confidential, Proprietary, and Trade Secret Information and Begins Working Surreptitiously for Aviation Concepts— a Direct Competitor of AMETEK.**

67.     In recent weeks, despite being engaged as a consultant for AMETEK, an AMETEK sales employee observed Linares coming and going from the Miami, Florida facility of Aviation Concepts—which moved into that former AMETEK facility in December 2023.

68.     Because Aviation Concepts is a direct competitor of AMETEK (*see* Aviation Concepts' description of its business on its website at https://aviationconcepts.com/about-us/), it is extremely unlikely that Linares would have any reason to be in Aviation Concepts' facility that did not involve wrongfully collaborating with that Company to compete with AMETEK.

69.     Linares's behavior was particularly suspicious given that Aviation Concepts employs several recently departed former AMETEK employees from its Avtech division, including Herrera (Quality Systems Manager at AMETEK until October 2023) and Rodriguez (Lead Engineer, ATE at AMETEK until March 2024).

70.     In addition, in recent months, when AMETEK was working on the purchase price for a specialized machine, a second bidder for the machine materialized at the eleventh hour and forced AMETEK to bid significantly higher in order to obtain the machine.

71.     Upon information and belief, the second bidder was Aviation Concepts, who intended to use the machine to compete with AMETEK and was able to nearly outbid AMETEK using AMETEK's own confidential pricing information.

72.     Because Linares working for a competitor—in direct violation of his non-compete obligations to AMETEK—would be devastating to AMETEK's business, AMETEK further investigated and confirmed that Linares was indeed entering and exiting the Aviation Concepts facility and observed him doing so on three different days in June 2024.

73.   In light of Linares's recent behavior, AMETEK expanded its investigation to determine whether Linares and any other former employees had been working with Aviation Concepts while still employed by AMETEK.

74.   AMETEK's investigation revealed that Linares and Herrera had been secretly working with Aviation Concepts' President, Dean Wood, to unfairly compete with AMETEK as early as August 2023—while both Linares and Herrera were still employed by AMETEK.

75.   To describe just one example of the alarming conduct AMETEK's investigation brought to light: In an August 29, 2023 email from Herrera's personal email address to Linares's personal email address, Herrera sent him "Customer invoices data (one year) separated by tester" (a tester is a piece of testing equipment necessary to diagnose faults and complete repairs of aircraft components).

76.   Upon information in belief, Linares and Herrera covertly took this information from AMETEK, and Herrera sent it to her personal email address in order to avoid detection by AMETEK.

77.   The next day, Linares forwarded that data to Wood. In the body of the email, he said the following to Wood: "GM, in the attachment please find a year of [production] by tester. Greta would like to know the name of the new aviation management system. Thanks."

78.   In response, Wood asked "When they refer to BENCH, which testers are these? Will we have this capability in the new shop?"

79.   The data referenced in this email exchange constitutes confidential, proprietary, and trade secret information of AMETEK, and its disclosure to a competitor such as Aviation Concepts could be devastating to AMETEK's business.

80.     Specifically, the data Linares and Herrera wrongfully disclosed contains, among other things, the revenue, margins, pricing, and an array of other information for all the different testing machines at the Florida facility AMETEK previously occupied—everything Aviation Concepts would need to undercut AMETEK with its customers once its new facility was up and running.

81.     Given Wood's question as to whether "**we**" will "have this capability in the new shop," Aviation Concepts plainly intends to use this and other misappropriated information from AMETEK to gain an unfair advantage at its new facility and to do so in conjunction with Linares and Herrera.

82.     Linares and Herrera also shared other sensitive information of AMETEK's including its complete general ledger, profit and loss statements, and other nonpublic financial information that would similarly enable Aviation Concepts to unfairly compete with AMETEK.

83.     Linares and Herrera continued this scheme after Herrera's departure from AMETEK. On at least one occasion, Linares emailed Herrera sensitive data about AMETEK and some of its most important customers.

84.     This email exchange demonstrates that both Linares and Herrera were secretly helping Aviation Concepts prepare to compete with AMETEK while still employed with AMETEK by misappropriating AMETEK's confidential, proprietary, and trade secret information and that Aviation Concepts sought to use this information to unfairly compete with AMETEK at its "new shop" (i.e., the Miami, Florida location where AMETEK used to operate).

85.     Similarly, before his departure from AMETEK, Rodriguez sent a variety of confidential AMETEK documents from his work email address to his personal email address,

including, among other things, contracts between AMETEK and key customers and manuals for specialized equipment AMETEK had to compensate other companies to acquire.

86.     Now that Rodriguez has these documents in his possession, he could easily share them with his new employer—if he has not done so already—to give the latter yet another unfair advantage in competing with AMETEK.

87.     Aviation Concepts building a competing business in South Florida using AMETEK's stolen confidential information as a foundation is far beyond just a theoretical possibility: Just in the past month, Aviation Concepts received its certifications from the Federal Aviation Administration and the European Union Aviation Safety Agency (the FAA's equivalent in the European Union), which are prerequisites for legally performing aircraft and/or aircraft component maintenance and repair in the United States and the EU (respectively).

88.     AMETEK's investigation also uncovered emails showing Linares and Herrera working with Aviation Concepts to purchase supplies necessary to fully equip the latter's Miami, Florida facility to compete with AMETEK.

89.     Aviation Concepts is now poised to use the misappropriated information described above, together with Linares, Herrera, and Rodriguez's flagrant violation of their contractual obligations, to unfairly compete with AMETEK in the immediate future, thereby causing irreparable harm to AMETEK's business interests.

90.     In addition, on June 18, 2024, a new, for-profit corporation named "AT4 Avionics Corporation" was registered with the State of Florida—with Herrera listed as its President, and Linares, Rodriguez, and another former AMETEK employee listed as its Vice Presidents.

91.     Upon information and belief, this new entity's registration is further evidence of Defendants' preparation to unfairly compete against AMETEK in the immediate future.

## VI.     **Defendants' Actions Violate AMETEK's Contractual and Legal Rights.**

92.     Despite being aware of his contractual obligations to AMETEK, Linares has misappropriated AMETEK's confidential, proprietary, and trade secret information and begun working for a direct competitor, Aviation Concepts, in direct violation of the confidentiality and non-competition clauses of the Agreements.

93.     Herrera and Rodriguez, despite being bound to nondisclosure of such information through the Confidentiality Agreements, have similarly misappropriated AMETEK's confidential, proprietary, and trade secret information—both during their employment with AMETEK and afterward with the assistance of Linares—for purposes of aiding their employer, Aviation Concepts, in its unfair competition with AMETEK.

94.     Aviation Concepts has aided and abetted Linares in his unlawful conduct by working with and continuing to work with him while fully aware that his work for Aviation Concepts violates the Agreements.

95.     Indeed, Aviation Concepts has already received and, upon information and belief, used AMETEK's confidential, proprietary, and trade secret information (as misappropriated for them by Linares, Herrera, and Rodriguez) to unfairly compete with AMETEK out of its new facility in Miami, Florida.

96.     Defendants' actions are intentional, willful, and malicious.

97.     Unless enjoined, Defendants will continue in their unlawful course of conduct, as they have shown for a clear intent to disregard Linares's post-employment obligations to AMETEK and malicious intent to misappropriate AMETEK's trade secrets for Aviation Concepts' benefit.

98.     Defendants' actions threaten to cause AMETEK imminent, irreparable harm, including, but not limited to, the loss of customers, profits, business reputation, market share, the disclosure of confidential information, and the loss of good will.

99.     Indeed, if the Court does not enjoin Defendants from furthering their unlawful conduct, AMETEK could suffer irreparable harm resulting in millions of dollars in lost business that can never be recovered.

100.     AMETEK therefore seeks temporary, preliminary, and permanent injunctive relief to (i) enforce Linares's contractual obligations, including, but not limited to, the noncompetition restriction; (ii) prevent Defendants' use and disclosure of AMETEK's confidential information; and (iii) protect its valuable customer and other business relationships and good will.

## VII.   Herrera and Rodriguez's Violations of their Severance Agreements with AMETEK.

101.     In connection with her separation from AMETEK on October 6, 2023, Herrera executed a Separation Agreement and Release ("the Herrera Severance Agreement").

102.     A true and correct copy of the Herrera Severance Agreement is attached as *Exhibit F*.

103.     Similarly, Rodriguez executed a Confidential Separation Agreement and Release In connection with his separation from AMETEK on March 29, 2024 ("the Rodriguez Severance Agreement") (together with the Herrera Severance Agreement, "the Severance Agreements").

104.     A true and correct copy of the Rodriguez Severance Agreement is attached as *Exhibit G*.

105.     In exchange for substantial severance payments and other separation benefits, Herrera and Rodriguez agreed to several terms, including a clause regarding return of AMETEK's property providing in relevant part:

> Employee agrees that on the effective date of Employee's termination from AMETEK, Employee will return to AMETEK any and all AMETEK property or equipment in Employee's possession, including but not limited to: any computer, hard or thumb drives, paper files, printer, fax, phone or other communication device, credit card, ID badge and keys.

(Exhibit F, ¶ 4; Exhibit G, ¶ 4).

106.    Both Herrera and Rodriguez have breached this provision by retaining, misappropriating, and, upon information and belief, using AMETEK's confidential, proprietary, and trade secret information in their employment with Aviation Concepts.

107.    The Severance Agreements also provide that "Any material breach of this Agreement by the Employee will result in the immediate cancellation of AMETEK's obligations under this Agreement and of any benefits that have been granted to the Employee by the terms of this Agreement…" (Exhibit F, ¶ 9; Exhibit G, ¶ 9).

108.    AMETEK is therefore entitled to recovery of the severance payments and other benefits conferred on Herrera and Rodriguez under the Severance Agreements.

<u>**COUNT I**</u>
**BREACH OF CONTRACT (The Employment Agreement)**
**(Defendant Linares)**

109.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

110.    The Employment Agreement is a valid, enforceable contract between Linares and AMETEK.

111.    AMETEK has satisfied all of its obligations under the terms and conditions of the Employment Agreement.

112.    By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Linares has violated and continues to violate the confidentiality clause of the Employment Agreement.

113.     By working for Aviation Concepts, a competitor of AMETEK's MRO Division, within one year of his termination of employment with AMETEK, Linares has violated and continues to violate the non-competition clause of the Employment Agreement.

114.     By such action, and as contractually stipulated by Linares, Linares has caused and continues to cause AMETEK immediate and irreparable harm for which AMETEK has no adequate remedy at law.

115.     Linares will continue such wrongful conduct unless enjoined.

116.     AMETEK has and will continue to suffer damages as a result of Linares's ongoing breach of his Employment Agreement.

117.     As a result of Linares's breach, and as agreed by Linares by executing the Employment Agreement, AMETEK is entitled to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

<u>**COUNT II**</u>
**BREACH OF CONTRACT (The Consultancy Agreement)**
**(Defendant Linares)**

118.     AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

119.     The Consultancy Agreement is a valid, enforceable contract between Linares and AMETEK.

120.     AMETEK has satisfied all of its obligations under the terms and conditions of the Consultancy Agreement.

121.     By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Linares has violated and continues to violate the confidentiality clause of the Consultancy Agreement.

122.     By working for Aviation Concepts, a competitor of AMETEK's MRO Division, during the term of the Consultancy Agreement, Linares has violated and continues to violate the non-competition clause of the Consultancy Agreement.

123.     By such action, and as contractually stipulated by Linares, Linares has caused and continues to cause AMETEK immediate and irreparable harm for which AMETEK has no adequate remedy at law.

124.     Linares will continue such wrongful conduct unless enjoined.

125.     AMETEK has and will continue to suffer damages as a result of Linares's ongoing breach of the Consultancy Agreement.

126.     As a result of Linares's breach, and as agreed by Linares by executing the Consultancy Agreement, AMETEK is entitled to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT (The Herrera Confidentiality Agreement)**
**(Defendant Herrera)**

127.     AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

128.     The Herrera Confidentiality Agreement is a valid, enforceable contract between Herrera and AMETEK.

129.     AMETEK has satisfied all of its obligations under the terms and conditions of the Herrera Confidentiality Agreement.

130.     By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Herrera has violated and continues to violate the confidentiality clause of the Herrera Confidentiality Agreement.

131.    By such action, Herrera has caused and continues to cause AMETEK immediate and irreparable harm for which AMETEK has no adequate remedy at law.

132.    Herrera will continue such wrongful conduct unless enjoined.

133.    AMETEK has and will continue to suffer damages as a result of Herrera's ongoing breach of the Herrera Confidentiality Agreement.

134.    As a result of Herrera's breach, AMETEK is entitled to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONTRACT (The Rodriguez Confidentiality Agreement)**
**(Defendant Rodriguez)**

135.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

136.    The Rodriguez Confidentiality Agreement is a valid, enforceable contract between Rodriguez and AMETEK.

137.    AMETEK has satisfied all of its obligations under the terms and conditions of the Rodriguez Confidentiality Agreement.

138.    By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Rodriguez has violated and continues to violate the confidentiality clause of the Rodriguez Confidentiality Agreement.

139.    By such action, Rodriguez has caused and continues to cause AMETEK immediate and irreparable harm for which AMETEK has no adequate remedy at law.

140.    Rodriguez will continue such wrongful conduct unless enjoined.

141.    AMETEK has and will continue to suffer damages as a result of Rodriguez's ongoing breach of the Rodriguez Confidentiality Agreement.

142.    As a result of Rodriguez's breach, AMETEK is entitled to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

## COUNT V
**BREACH OF CONTRACT (The Herrera Severance Agreement)**
**(Defendant Herrera)**

143.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

144.    The Herrera Severance Agreement is a valid, enforceable contract between Herrera and AMETEK.

145.    AMETEK has satisfied all of its obligations under the terms and conditions of the Herrera Severance Agreement.

146.    By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Herrera has violated and continues to violate the Herrera Severance Agreement.

147.    AMETEK has suffered damages as a result of Herrera's breach of the Herrera Severance Agreement.

148.    In addition, under paragraph 9 of the Herrera Severance Agreement, AMETEK is entitled to cancel and cease payment of all benefits due to Herrera under the Herrera Severance Agreement.

## COUNT VI
**BREACH OF CONTRACT (The Rodriguez Severance Agreement)**
**(Defendant Rodriguez)**

149.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

150.    The Rodriguez Severance Agreement is a valid, enforceable contract between Rodriguez and AMETEK.

151.    AMETEK has satisfied all of its obligations under the terms and conditions of the Rodriguez Severance Agreement.

152.    By misappropriating the confidential, proprietary, and trade secret information of AMETEK, Rodriguez has violated and continues to violate the Rodriguez Severance Agreement.

153.    AMETEK has suffered damages as a result of Rodriguez's breach of the Rodriguez Severance Agreement.

154.    In addition, under paragraph 9 of the Rodriguez Severance Agreement, AMETEK is entitled to cancel and cease payment of all benefits due to Rodriguez under the Rodriguez Severance Agreement.

**COUNT VII**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(All Defendants)**

155.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

156.    The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

157.    The DTSA further provides that "a court may grant an injunction – to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable…." 18 U.S.C. § 1836(b)(3)(A).

158.    Defendants have misappropriated an array of AMETEK's trade secret information, including, but not limited to, detailed customer pricing information, contracts between AMETEK and key customers, and detailed financial information such as the revenue, margins, pricing, and

other information for all the different testing machines at the Florida facility AMETEK previously occupied.

159.    The documents and data misappropriated by Defendants constitute trade secrets within the meaning of the DTSA because:

      a.    Such information is not known outside AMETEK and is known within AMETEK's business only on a need-to-know basis.

      b.    AMETEK takes reasonable measures to protect the secrecy of this information. This information is highly valuable and derives its value from being secret. AMETEK expends considerable effort and expense to generate this information.

      c.    This information is exceedingly difficult, if not impossible, for others to properly acquire or duplicate without AMETEK's authorization, and is not readily ascertainable.

      d.    This information would be highly valuable to AMETEK's competitors.

160.    Linares, Herrera, and Rodriguez used improper means to misappropriate this information in that they secretly emailed such information to themselves and to Aviation Concepts, a direct competitor of AMETEK, while still employed with AMETEK.

161.    Upon information and belief, Linares, Herrera, and Rodriguez misappropriated AMETEK's trade secrets so that they could use them for the benefit of themselves and Aviation Concepts and to AMETEK's detriment.

162.    Upon information and belief, Defendants have used and will continue to use such information to AMETEK's detriment.

163.    AMETEK has suffered irreparable harm as a result of such conduct, will continue to suffer irreparable harm in the absence of injunctive relief, and has no adequate remedy at law without injunctive relief.

164.    Accordingly, AMETEK is entitled to a temporary restraining order, preliminary and permanent injunction, and damages in an amount to be proven at trial.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH A CONTRACT**
**(All Defendants)**

165.    AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

166.    Aviation Concepts, by working with Linares, and upon information and belief with knowledge of Linares's obligations to AMETEK, including his obligations to not disclose AMETEK's confidential, proprietary, and trade secret information and to not compete against AMETEK, has interfered with and induced Linares to breach the terms of the Agreements.

167.    Upon information and belief, even with knowledge of Linares's obligations and the existence of the Agreements, Aviation Concepts continues to interfere with and induce Linares to breach the terms of his Agreements with AMETEK.

168.    Similarly, by assisting Linares in misappropriating AMETEK's confidential, proprietary, and trade secret information, Herrera and Rodriguez have aided and encouraged Linares's violations of his confidentiality obligations in the Agreements.

169.    Likewise, Defendants, while being aware of Herrera and Rodriguez's confidentiality obligations to AMETEK, have induced and assisted in Herrera and Rodriguez's violations of the Confidentiality Agreements.

170.    Defendants' conduct in interfering with Linares, Herrera, and Rodriguez's existing contractual relations was and is willful, intentional, and unprivileged, and has caused and is continuing to cause irreparable harm as well as monetary damages to AMETEK.

171.    Accordingly, AMETEK is entitled to a temporary restraining order, preliminary and permanent injunction, and damages in an amount to be proven at trial.

**COUNT IX**
**BREACH OF DUTY OF LOYALTY**
**(Defendants Linares, Herrera, and Rodriguez)**

172.     AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

173.     As employees of AMETEK, Linares, Herrera, and Rodriguez owed the Company a duty of loyalty and good faith.

174.     By misappropriating AMETEK's confidential, propriety, and trade secret information during his employment with AMETEK and sharing it with Aviation Concepts to allow the latter to unfairly compete with AMETEK, Linares, Herrera, and Rodriguez breached their duty of loyalty to AMETEK.

175.     Linares, Herrera, and Rodriguez's breach of their duty of loyalty to AMETEK has caused and will continue to cause AMETEK to suffer damages, including monetary damages and irreparable harm to its business interests.

176.     Accordingly, AMETEK is entitled to a temporary restraining order, preliminary and permanent injunction, and damages in an amount to be proven at trial.

**COUNT X**
**CIVIL CONSPIRACY**
**(All Defendants)**

177.     AMETEK re-alleges and incorporates by reference the allegations in Paragraphs 1 through 108 as though fully alleged herein.

178.     Linares, Herrera, Rodriguez, and Aviation Concepts' communications demonstrate that they have agreed to a campaign of unlawful competition against AMETEK through misappropriation of AMETEK's confidential, proprietary, and trade secret information and Linares's violation of his non-compete obligations to AMETEK.

179.     In support of that conspiracy, Linares, Herrera, Rodriguez, and Aviation Concepts have committed multiple overt acts, include Linares, Herrera, and Rodriguez misappropriating AMETEK's confidential, proprietary, and trade secret information while still employed with AMETEK and sending it to Aviation Concepts in order to give them an unfair advantage.

180.     Linares has also, with Aviation Concepts' assistance, violated his non-compete obligations under the Agreements by working with a direct competitor of AMETEK during the restricted periods set forth in those Agreements.

181.     Defendants' unlawful actions have caused and will continue to cause AMETEK irreparable harm to its business. Accordingly, AMETEK is entitled to a temporary restraining order, preliminary and permanent injunction, and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff AMETEK, respectfully requests that this Court:

A.     Temporarily, preliminarily, and permanently enjoin Linares for a period of twelve (12) months from the date of this Court's order from directly or indirectly working for Aviation Concepts in a capacity that is competitive to the business conducted by AMETEK;

B.     Temporarily, preliminarily, permanently enjoin Aviation Concepts for a period of twelve (12) months from the date of this Court's order from directly or indirectly working with Linares in a capacity that is competitive to AMETEK's MRO Division;

C.     Temporarily, preliminarily, permanently enjoin Defendants from disclosing or using AMETEK's confidential, proprietary, and trade secret information;

D.     Otherwise order and require Linares to comply with the terms of the Agreements, and the restrictive covenants contained therein;

E.      Otherwise order and require Herrera and Rodriguez to comply with the terms of the Confidentiality Agreements and the restrictive covenants contained therein;

F.      Award damages for all of Defendants' wrongful conduct proved at trial;

G.      Award AMETEK its attorneys' fees, costs, and expenses, as well as pre-and post-judgment interests; and

H.      Grant such other and further relief as the Court may deem just, equitable, and proper.

**Dated**: July 10, 2024                                   Respectfully submitted,

                                                          */s/ Miguel A. Morel*
                                                          Miguel A. Morel (FBN 89163)
                                                          mamorel@littler.com
                                                          Ryan P. Forrest (FBN 111487)
                                                          rforrest@littler.com
                                                          LITTLER MENDELSON P.C.
                                                          333 SE 2nd Avenue, Suite 2700
                                                          Miami, FL 33131
                                                          PH:  305.400.7500

                                                          Theodore A. Schroeder (PA No. 80559)**
                                                          tshroeder@littler.com
                                                          Sean P. Dawson (PA No. 326085)**
                                                          sdawson@littler.com

                                                          LITTLER MENDELSON P.C.
                                                          625 Liberty Avenue, 26th Floor
                                                          Pittsburgh, PA 15222
                                                          PH: 412.201.7624 / 7601 / 7678
                                                          FAX: 412.774.1959

                                                          *Attorneys for Plaintiff*

                                                          **Pro hac vice motions forthcoming

## **VERIFICATION**

I, Kari McCloud, verify that I am the Division Vice President, Finance - MRO for AMETEK, Inc., that I am authorized to make this Verification on behalf of AMETEK, Inc., and that the statements of fact contained in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. I understand that this Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated: July 10, 2024

_Kari McCloud_
KARI McCLOUD