UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-22622-ALTONAGA/Reid

AMETEK, INC.,

               Plaintiff,

v.

RICARDO LINARES, GRETA HERRERA,
EDUARDO RODRIGUEZ, and AVIATION
CONCEPTS MRO, LLC,

               Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS VERIFIED COMPLAINT AND
TO COMPEL ARBITRATION OF CERTAIN CLAIMS**

      Defendants, Ricardo Linares ("Linares"), Greta Herrera ("Herrera"), and Eduardo Rodriguez ("Rodriguez") (collectively, "Individual Defendants"), and Aviation Concepts MRO, LLC ("AC MRO") (together with the Individual Defendants, "Defendants"), through their undersigned counsel[1] and pursuant to S.D. Fla. L.R. 7.1, Fed. R. Civ. P. 12(b)(1), 12(b)(3), and 12(b)(6), move to dismiss Plaintiff Ametek, Inc.'s ("Plaintiff" or "Ametek") Verified Complaint, [ECF No. 1] (the "Complaint" or "Compl."), as more fully set forth below.

## I.    INTRODUCTION

      In this case, Ametek is attempting to pin on the Individual Defendants and AC MRO the results of Ametek's own poor decision to move one of its companies, including its equipment and operations but not its expert personnel, from Miami to London. But Ametek's rush to place the blame for the financial impact of its misguided move of the Miami MRO business lacks a sufficient factual basis, which Ametek now hopes to find through a premature bid for expedited discovery with a corresponding unfounded request for preliminary injunctive relief. *See* [ECF Nos. 31, 32].

      Ultimately, the Complaint is the culmination of Ametek's attempt to weaponize vague and amorphous language to distract the Court from the inevitable result of Ametek's insufficient

---

[1] Defendants submit this combined response pursuant to the Court's Order dated July 16, 2024. *See* [ECF No. 15] ("Defendants shall submit a single, combined response[.]").

pleading. In the Complaint, Ametek surreptitiously seeks to avoid clear procedural mandates and otherwise offers conclusory allegations without any factual support. Procedurally, Ametek selectively highlights favorable language from its agreements with the Individual Defendants, while ignoring applicable mandatory venue selection and arbitration provisions. Indeed, the Complaint is purposefully vague regarding the Individual Defendants' alleged actions and applicability of the Individual Defendants' various agreements to those actions because Ametek's claims largely fall within binding venue selection or arbitration clauses. And to the extent that they do not, the Complaint generally fails to state any actionable claims against any of the Defendants. As a result, the Complaint is subject to dismissal.

## II.     FACTUAL BACKGROUND

As alleged in the Complaint, Ametek designs and manufactures electronic instruments and electromechanical devices for, as relevant in this case, the aerospace market. Compl. ¶ 1. Linares, along with Herrera and Rodriguez, managed Avtech Avionics and Instruments ("Avtech"), an avionics repair station certified by the Federal Aviation Administration and founded in 2009. In November 2012, Ametek acquired Avtech, which became part of Ametek's Maintenance, Repair, and Overhaul ("MRO") division. *Id.* ¶¶ 22-23. In conjunction with Ametek's acquisition of Avtech, Linares entered into an employment agreement with Ametek. *Id.* ¶ 23; *see also* [ECF No. 1-6] ("Linares Employment Agreement"). The Linares Employment Agreement was in force for an initial term of three years, which Ametek and Linares extended various times, including the most recent Third Modification to Employment Agreement, which governed Linares' employment with Ametek between July 1, 2023 and March 31, 2024. *Id.* ¶¶ 39; *see also* [ECF No. 1-7] ("Linares Extension"). Following termination of the Linares Extension on March 31, 2024, Ametek engaged Linares as a consultant, and Linares executed a consultancy agreement on April 22, 2024. *Id.* ¶¶ 51-53; *see also* [ECF No. 1-8] ("Linares Consultancy Agreement"). The Linares Consultancy Agreement contains a mandatory arbitration provision. [ECF No. 1-8] at 7-8, ¶ 18.

When Ametek acquired Avtech, Herrera and Rodriguez also became employed by Ametek, and in conjunction with their employment, they executed confidentiality agreements, which contain venue selection clauses, designating Pennsylvania as the applicable venue for disputes arising from those agreements. *Id.* ¶¶ 61-62, 64-65; *see also* [ECF No. 1-9] ("Herrera Confidentiality Agreement") ¶ 6; [ECF No. 1-10] ("Rodriguez Confidentiality Agreement") ¶ 6. When Ametek fired Herrera on October 6, 2023, and Rodriguez on March 29, 2024, they both

executed a separation agreement. *Id.* ¶¶ 101, 103; *see also* ECF No. [1-11] ("Herrera Separation Agreement"); *see also* ECF No. [1-12] ("Rodriguez Separation Agreement"). The Herrera Separation Agreement and Rodriguez Separation Agreement contain mandatory arbitration provisions. [ECF No. 1-11] at 7 ¶ 17; [ECF No. 1-12] at 7 ¶ 18. None of the agreements entered into by Herrera or Rodriguez contain non-competition provisions.

In July 2023, Ametek announced that it planned to relocate its Miami MRO operations, including Avtech, to London. The only fact alleged in the Complaint to support Ametek's assumption that Linares was working with AC MRO is that an Ametek employee observed Linares "coming and going" from Ametek's former facility in Miami, which was then occupied by AC MRO, alleged to be a direct competitor of Ametek. *Id.* ¶¶ 67-68. According to Ametek, Linares was observed entering and exiting AC MRO's facility on three different days in June 2024. *Id.* ¶ 72. Ametek alleges further that Herrera and Rodriguez are employed by AC MRO. *Id.* ¶ 69. Based on Linares' observed behavior, Ametek purportedly conducted further investigation, and allegedly discovered that "Linares and Herrera had been secretly working with" AC MRO as early as August 2023, while still employed by Ametek. *Id.* ¶ 74.

The only specific allegation regarding Linares and Herrera's supposed work with AC MRO is that Ametek discovered an email dated August 29, 2023 that Herrera sent from her personal email address to Linares' personal email address, regarding "Customer invoices data (one year) separated by tester." *Id.* ¶ 75. Ametek then alleges "upon information and belief" that Linares and Herrera took this information and shared it with AC MRO. *Id.* ¶¶ 76-78. Ametek alleges in conclusory fashion that the data referenced in the emails is trade secrets, containing "the revenue, margins, pricing, and an array of other information for all the different testing machines," and claims that Linares and Herrera also shared additional non-public financial information. *Id.* ¶¶ 80, 82. With respect to Rodriguez, Ametek alleges that prior to his "departure" from Ametek, he sent documents from his work email to his personal email, including Ametek contracts with key customers and specialized equipment manuals. *Id.* ¶ 85. Ametek asserts that these actions violate Defendants' obligations under their various agreements. *Id.* ¶¶ 92-94; 101-06.

As a result of Defendants' purported breaches, Ametek asserts the following claims:

- Breach of the Linares Employment Agreement (Count I), by misappropriating confidential trade secret information and violating a non-competition clause;

- Breach of the Linares Consultancy Agreement (Count II), by misappropriating confidential trade secret information and violating a non-competition clause;

- Breach of the Herrera Confidentiality Agreement (Count III), by misappropriating confidential trade secret information;

- Breach of the Rodriguez Confidentiality Agreement (Count IV), by misappropriating confidential trade secret information;

- Breach of the Herrera Separation Agreement (Count V), by misappropriating confidential trade secret information;

- Breach of the Rodriguez Separation Agreement (Count VI), by misappropriating confidential trade secret information;

- Violation of the Defendant Trade Secrets Act ("DTSA") (Count VII) against the Individual Defendants and AC MRO;

- Tortious interference with the Linares, Herrera, and Rodriguez's contracts (Count VIII) by the Individual Defendants and AC MRO;

- Breach of the duty of loyalty (Count IX) against the Individual Defendants; and,

- Civil conspiracy (Count X) against the Individual Defendants and AC MRO.

To the extent that Ametek's claims against the Individual Defendants are premised upon alleged actions that occurred during the timeframes encompassed within agreements containing venue selection or arbitration clauses, those claims must be dismissed. The claims against AC MRO, and any remaining claims against the Individual Defendants, are subject to dismissal under Rule 12(b)(6).

### III.   LEGAL STANDARD

#### A.  Rule 12(b)(6)

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Reva, Inc. v. Humana Health Benefit Plan of La., Inc.*, 18-20136-CIV, 2018 WL 1701969, at *2 (S.D. Fla. Mar. 19, 2018). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*,

550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citation omitted).

Upon a motion to dismiss, a court construes the complaint in the light most favorable to the plaintiff and accepts its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citations omitted). "Unsupported allegations and conclusions of law, however, will not benefit from this favorable reading." *Reva, Inc.*, 2018 WL 1701969, at *2 (citing *Iqbal*, 556 U.S. at 679); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth*., 566 U.S. 449 (2012) ("Unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of a plaintiff's allegations.") (cleaned up).

The Court must not accept, without more, conclusory allegations and unwarranted deductions of fact. *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1025 (11th Cir. 2003) (conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal); *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (same). To survive a motion to dismiss, Plaintiff must do more than merely state legal conclusions; Plaintiff is required to allege specific factual bases for those conclusions or face dismissal of its claims. *Jackson v. BellSouth Telecomm'ns*, 372 F.3d 1250, 1263 (11th Cir. 2004). Conclusory allegations that Defendant violated laws and Plaintiff was injured will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief. *City of Gainesville v. Fla. Power & Light Co.*, 488 F. Supp. 1258, 1263 (S.D. Fla. 1980).

**B. Rule 12(b)(3)**

"Rule 12(b)(3) is the proper avenue for a party's request for dismissal based on a forum-selection clause." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1333 (11th Cir. 2011). Forum or venue selection clauses "are presumptively valid and enforceable unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009). In general, "unless the forum selection clause is shown to deny the party its right to present its case due to the unreasonableness or inconvenience of the forum, it will be upheld." *Dublicom Ltd. v. Nat'l Merch. Ctr.*, No. 10-24563-CIV, 2011 WL 13223556, at *2 (S.D. Fla. Mar. 15, 2011).

### C. Arbitration

"The Federal Arbitration Act ('FAA') establishes a general federal policy favoring arbitration." *Mims v. Glob. Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1352 (S.D. Fla. 2011) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217-218 (1985)); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ." (alterations added)). "As a result of the well-established federal policy . . . the burden is on the party opposing arbitration to prove to the court that arbitration is improper." *Kozma v. Hunter Scott Fin., LLC*, No. 09-80502-CIV, 2010 WL 724498, at *2 (S.D. Fla. Feb. 25, 2010) (alteration added) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26–27 (1991)).

The presence of a valid arbitration provision raises a strong presumption in favor of enforcement. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 630-31 (1985) (stressing that the enforcement of a mutually agreed upon arbitration or forum-selection clause serves as an "indispensable precondition to the achievement of the orderliness and predictability essential to any international business transaction"). Indeed, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, "embodies a 'liberal federal policy favoring arbitration agreements.'" *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1366 (11th Cir. 2008) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). Accordingly, the FAA requires courts to "rigorously enforce agreements to arbitrate." *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 312 F.3d 1349, 1357-58 (11th Cir. 2002) (cleaned up); *see also Hemispherx Biopharma, Inc.*, 553 F.3d at 1366 (citing *Dean Witter Reynolds, Inc.*, 470 U.S. at 221). Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The Eleventh Circuit treats a request to dismiss or compel arbitration as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Schriever v. Navient Sols., Inc*., 2014 WL 7273915, at *2 (M.D. Fla. Dec. 19, 2014) (citing *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). As such, the Court may consider matters outside of the four corners of the complaint. *Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1329 (S.D. Fla. 2009).

IV.     ARGUMENT

A.  The Complaint is a shotgun pleading

Shotgun pleadings are disallowed, as a matter of law.[2] No matter the type, "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323.

The Complaint is a shotgun pleading. Here, by failing to differentiate among the agreements and the corresponding specific actions taken by the Individual Defendants that are alleged to have violated those agreements, the Complaint fails to provide adequate notice of the grounds upon which each claim against the Individual Defendants rests.

Specifically, Ametek alleges that the Individual Defendants violated their agreements by sending emails in August 2023 containing purported trade secrets, and by subsequently sharing those trade secrets with AC MRO.[3] *See* Compl. ¶¶ 75, 77. Ametek also alleges that Linares violated his agreements because he was seen exiting AC MRO's facility in June 2024. *Id*. ¶¶ 67, 72. However, Ametek does not explain how actions allegedly taken by the Individual Defendants in 2023 when they were still employed by Ametek (and governed by one set of agreements) could possibly violate the terms of any subsequent agreements not yet in effect, or how actions taken by the Individual Defendants in 2024 could possibly violate the terms of the previous agreements in

---

[2] The Eleventh Circuit has identified four principal types of shotgun pleadings:

> The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Merch. One, Inc. v. TLO, Inc.*, No. 19-CV-23719, 2020 WL 248608, at *3 (S.D. Fla. Jan. 16, 2020) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) (footnotes omitted).

[3] There are six (6) agreements in total involved—two (2) for each Individual Defendant, which were in force at different times throughout the conduct alleged in the Complaint.

effect prior to their terminations. By reincorporating all the factual allegations regarding undifferentiated violations of the various agreements into every count of the Complaint, Ametek indiscriminately lumps all of the Individual Defendants' purported violations and the agreements that govern each. As a result, the Complaint is a shotgun pleading subject to dismissal. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1359 n.9 (11th Cir. 1997) ("The Chudasamas' complaint is an all-too-typical shotgun pleading. The four counts it presents follow forty-three numbered paragraphs of factual allegations, many of which are vague. Each count has two numbered paragraphs, the first of which incorporates by reference all forty-three paragraphs of factual allegations. Many of the factual allegations appear to relate to only one or two counts, or to none of the counts at all. Thus, a reader of the complaint must speculate as to which factual allegations pertain to which count.").

Ametek's aim in so pleading is evident—the agreements contain venue selection clauses and arbitration provisions that preclude the bulk of Ametek's claims in this Court—which Ametek plainly and impermissibly seeks to avoid.

## B. Ametek's claims against Herrera and Rodriguez are not properly before this Court

### i. Claims during employment are subject to a binding venue provision

To the extent that Ametek's claims are premised upon any actions allegedly taken by Herrera and Rodriguez while they were still employed by Ametek, and therefore governed only by their Confidentiality Agreements, those claims should be dismissed for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. Both the Herrera and Rodriguez Confidentiality Agreements contain the same provision stating in pertinent part as follows:

> I agree . . . that *any legal proceeding relating to this Agreement* shall be conducted in the United States District Court for the Eastern District of Pennsylvania or in the Court of Common Pleas, Chester County, Pennsylvania.

*See* [ECF Nos. 1-9, 1-10] ¶ 6 (emphasis added).[4] Ametek's claims against Herrera and Rodriguez are premised in part upon their purported breaches of their Confidentiality Agreements, and therefore fall within these broad venue selection clauses. Thus, notwithstanding Ametek's

---

[4] "A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

conclusory allegation regarding venue in the Complaint, *see* Compl. ¶ 20, the Court should enforce the venue selection clauses in the Confidentiality Agreements, dismiss the claims for improper venue, and require that Ametek assert its claims in the correct Pennsylvania venue.

### ii.   Claims after termination are subject to a mandatory arbitration provision

"By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 213. Thus, if the criteria above are satisfied, a court is required to issue an order compelling arbitration. *See John B. Goodman Ltd. P'ship v. THF Constr., Inc.*, 321 F.3d 1094, 1095 (11th Cir. 2003) ("Under the FAA, . . . a district court must grant a motion to compel arbitration if it is satisfied that the parties actually agreed to arbitrate the dispute.").

To the extent that Ametek's claims are premised upon actions allegedly taken by Herrera and Rodriguez after they were unceremoniously terminated, and therefore governed by their Separation Agreements, those claims should be dismissed because they are subject to mandatory arbitration. The FAA "reflect[s] both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2001)). "Where the parties have agreed to arbitrate their dispute, the job of the courts – indeed, the obligation – is to enforce the agreement." *Id.* (citing *Stolt v. Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 682 (2010)).

Both the Herrera and Rodriguez Separation Agreements contain the same provision stating unequivocally, and in pertinent part, as follows:

> Employee and AMETEK agree to resolve *any disputes they may have with each other*, *including any issues arising or related to the interpretation and enforcement of this Agreement* and any of the matters herein released through final and binding arbitration. . . . THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY.

[ECF No. 1-11] ¶ 17; [ECF No. 1-12] ¶ 18 (emphasis added). These clauses are broad and encompass all of the claims against Herrera and Rodriguez that Ametek seeks to assert before the Court. *See Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221-22 (11th Cir. 2000) (holding that agreement to arbitrate "all claims between the parties" applied not just to claims arising out of

the parties' contract). As a result, the Court should dismiss the claims against Herrera and Rodriguez, and require that Ametek pursue them properly through arbitration proceedings.

**C.  The Linares Consultancy Agreement also requires arbitration**

The Linares Consultancy Agreement contains a mandatory and even broader arbitration clause, stating as follows:

> Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope of applicability of this agreement to arbitrate, shall be determined by arbitration in Philadelphia, PA before one arbitrator.

[ECF No. 1-8] ¶ 18. *See Mercury Telco Grp., Inc. v. Empresa de Telecommunicaciones de Bogota S.A. E.S.P.*, 670 F. Supp. 2d 1350, 1355 (S.D. Fla. 2009) (concluding that an arbitration clause that provided for arbitration of "[a]ny dispute between the parties *relating to* the execution, interpretation, existence, validity, performance, termination, liquidation *and other aspects of the Agreement*" was considered broad, and showed parties' intent to arbitrate any dispute connected to the contract containing the arbitration clause) (emphasis added); *see also Shea v. BBVA Compass Bancshares, Inc.*, No. 10-22353-Civ., 2013 WL 869526, at *5 (S.D. Fla. Mar. 7, 2013) (where "arising out of or relating to" language in the arbitration clause deemed broad enough to encompass "virtually all disputes between contracting parties."); *Schatt v. Aventura Limousine & Transp. Serv., Inc*., No. 10-CV-22353, 2010 WL 4942654, at *4 (S.D. Fla. Nov. 30, 2010) (same).

Thus, to the extent that Ametek's claims against Linares are premised upon actions allegedly taken by Linares during the time his relationship with Ametek was governed by the Consultancy Agreement, those claims are subject to mandatory arbitration and should be dismissed. *See Foley v. Morgan Stanley & Co., Inc.*, No. 11-CV-60348-MIDDLEBROOKS/JOHNSON, 2011 WL 13267089, at *4 (S.D. Fla. Mar. 30, 2011) (concluding that tortious interference claim subject to arbitration under employment agreement containing similarly broad language).

### D.  Any remaining claims are subject to dismissal for failure to state a claim against the Individual Defendants and AC MRO[5]

The Complaint fails to sufficiently state claims against Defendants to the extent that any such claims are not dismissed pursuant to the applicable venue selection and mandatory arbitration provisions.[6]

*Breach of contract claims* (Counts I-VI)

### i.   No breach for sharing information internally

"Under Pennsylvania law, a breach of contract claim requires a plaintiff to prove (1) the existence of a contract; (2) a breach of a duty imposed by that contract; and (3) damages." *Ruggiero v. Nocenti*, 556 F. Supp. 3d 512, 525 (E.D. Pa. 2021). "The purpose[] of damages in contract actions is to return the parties to the position they would have been in but for the breach." *Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 385 (Pa. 2001).

Ametek's breach of contract claims premised upon violations of confidentiality provisions contained in the Individual Defendants' various agreements fail to sufficiently allege any breach to the extent that they are premised upon any sharing of information among the Individual Defendants. With respect to the only specifically alleged communication in August 2023, the governing agreements (Linares Employment Agreement, Herrera Confidentiality Agreement, and Rodriguez Confidentiality Agreement) do not prohibit the disclosure of purportedly confidential information internally. The Linares Employment Agreement specifies that he "will not disclose communicate, or divulge [Proprietary Information] to, or use the same for the direct or indirect benefit of, any person or entity *other than the Corporation*." [ECF No. 1-6] at 8, ¶ 10.(c) (emphasis added). Similarly, the Herrera and Rodriguez Confidentiality Agreements state that they "will not disclose Confidential Information to anyone *outside of the Company*, either during or after my employment with the Company[.]" [ECF Nos. 1-9, 1-10] ¶ 1 (emphasis added). In August 2023, the Individual Defendants were employed by Ametek, and as alleged in the Complaint, sent

---

[5] Because all of the claims against Herrera and Rodriguez are subject to dismissal for improper venue or subject to binding arbitration, the only claims remaining are against Linares (for his purported actions governed by the Linares Employment Agreement) and AC MRO.

[6] All of the agreements contain choice of law provisions specifying that they are governed by the laws of Pennsylvania. *See* [ECF No. 1-6] ¶ 28; [ECF No. 1-8] ¶ 18; [ECF No. 1-9] ¶ 6; [ECF No. 1-10] ¶ 6; [ECF No. 1-11] ¶ 19]; [ECF No. 1-12] ¶ 20. Accordingly, the Individual Defendants cite Pennsylvania law in support of their arguments. However, the claims against AC MRO are not subject to a choice of law provision, and are therefore analyzed under Florida law.

information among or to themselves. Thus, based on the plain language of the agreements that governed, the Complaint fails to state a breach of contract.

      **ii.**    **The allegations of confidentiality are conclusory**

With respect to any purported breaches after the Individual Defendants were terminated, the Complaint states only in conclusory fashion that the information was confidential. For example, Ametek alleges that the email sent by Linares to Wood included "a year of [production] by tester," Compl. ¶ 77, but otherwise does not allege any facts to support that the information contained in the communication with Wood was confidential—Ametek does not attach the purportedly violative emails. In addition, the Complaint alleges that "Linares and Herrera also shared other sensitive information . . . including [Ametek's] complete general ledger, profit and loss statements, and other nonpublic financial information," but notably does not specify whether Linares and Herrera shared this information with any third party.[7] Similarly, Rodriguez is alleged to have sent himself information including contracts with key customers and manuals for specialized equipment, Compl. ¶ 85. However, sharing of information internally among the Individual Defendants is not precluded by the confidentiality provisions of any of the governing agreements.

      **iii.**    **No damages alleged for purported breaches of contract**

Ametek further fails to allege any facts in support of the purported damages it has suffered. The Complaint does not allege that Ametek has lost customers or business as a result of the Individual Defendants' purported breaches. Instead, Ametek invites the Court to engage in rank speculation that Ametek will be damaged by the Individual Defendants' potential use of its purportedly confidential information.

*DTSA claim (Count VII)*

To prevail on a claim for misappropriation of trade secrets under DTSA, a plaintiff must establish the existence of a trade secret and misappropriation of the trade secret. *Fla. Beauty Flora Inc. v. Pro Intermodal L.L.C.*, No. 20-20966, 2021 WL 1945821, at *4 (S.D. Fla. May 14, 2021); *see also Houser v. Feldman*, 569 F. Supp. 3d 216, 223 (E.D. Pa. 2021) ("To state a claim under the DTSA, a plaintiff must allege: (1) the existence of a trade secret, defined generally as

---

[7] As discussed more fully with respect to Ametek's DTSA claim, much of the information Ametek claims is confidential or trade secret is in fact publicly available due to Ametek's status as a "global" and publicly-traded corporation.

information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret.") (cleaned up).

### i.    Ametek fails to sufficiently allege the trade secrets

The DTSA defines a "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . if . . . the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

A "plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery." *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (citations omitted); *see also Elmagin Cap., LLC v. Chen*, 555 F. Supp. 3d 170, 177 (E.D. Pa. 2021) ("To establish the existence of a trade secret, a plaintiff must describe it with a reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each statutory element of a trade secret.") (cleaned up). A plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *WWMAP, LLC v. Birth Your Way Midwifery*, --- F.Supp.3d ----, 2024 WL 151411, at *2 (N.D. Fla. Jan. 10, 2024); *see also Elmagin Cap., LLC*, 555 F. Supp. 3d at 177 ("This identification must be particular enough as to separate the trade secret from matters of general knowledge in the trade . . . or special knowledge of persons skilled in the trade.") (cleaned up).

Ametek alleges that Defendants were privy to and misappropriated its trade secrets, including financial, pricing, and customer information. However, the Complaint does not allege any facts in support of Ametek's conclusory allegations that the information is not generally known or readily ascertainable through proper means or valuable to a third party. Indeed, as a "global" and publicly-traded corporation, Ametek is required to make fulsome financial disclosures to the U.S. Securities and Exchange Commission, which are publicly available. In

addition, simply because Ametek treated certain information as confidential does not automatically make that information trade secret in the absence of any allegations to establish the other statutory elements. *See* 18 U.S.C. § 1839(3)(A)-(B). Rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements are not entitled to an assumption of truth. *Iqbal*, 556 U.S. at 678; *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (same).

### ii. Ametek fails to sufficiently allege misappropriation

Misappropriation can occur in three ways: (1) acquisition; (2) disclosure; or (3) use. *See* 18 U.S.C. § 1839(5). Misappropriation by acquisition occurs when a trade secret is acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means." *M.C. Dean, Inc. v. City of Miami Beach*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) (quoting 18 U.S.C. § 1839(5)(A)) (dismissing DTSA claim for failure to plead misappropriation). Misappropriation by disclosure or use occurs when a person discloses or uses a trade secret "without express or implied consent" and either

(i)      used improper means to acquire knowledge of the trade secret, or

(ii)     at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret.

*Id.* at 1353-54 (quoting § 1839(5)(B)).

Here, to the extent Ametek's complaints of misappropriation are directed at AC MRO, Ametek's allegations appear to be based upon either acquisition or use.[8] As for misappropriation by acquisition, Ametek asserts, without plausible factual support, that "[AC MRO] has already received" trade secret information, alleging that the Individual Defendants "secretly emailed [AMETEK's] information . . . to [AC MRO]." Compl. ¶¶ 95, 160. Ametek further alleges that "Linares and Herrera . . . shared other sensitive information of Ametek's including its complete general ledger, profit and loss statements, and other nonpublic financial information." *Id.* ¶ 82. But

---

[8] Some of Ametek's allegations are conclusory to the point that it is impossible to discern whether acquisition, disclosure, or use is being alleged. *See, e.g.*, Compl. ¶ 158 ("Defendants have misappropriated an array of AMETEK's trade secret information . . . .").

Ametek does not identify when, by what means, or with whom such "sensitive information" was shared—leaving the court to speculate that such information ever reached AC MRO.[9]

Ametek also alleges that, "[o]n at least one occasion, Linares emailed Herrera sensitive data about AMETEK and some of its most important customers," thereby "demonstrat[ing] that both Linares and Herrera were secretly helping [AC MRO] prepare to compete with AMETEK." *Id.* ¶¶ 83-84. But, again, Ametek does not allege that AC MRO was involved in the referenced email exchange. Finally, Ametek alleges that, in August 2023, Linares received from Herrera and then forwarded to AC MRO's President Dean Wood an email containing "[c]ustomer invoices data (one year) separated by tester." *Id.* ¶¶ 75-78. But even assuming receipt of an email qualifies as "acquisition," Ametek nowhere alleges facts plausibly establishing that AC MRO knew or had reason to know that anything it allegedly received by email—whether customer invoices data or unspecified "other sensitive information"—was trade secret information acquired by improper means. Without plausibly pleading facts indicating such knowledge, Ametek fails to state a claim.

Ametek's allegations of misappropriation by use fare no better. Ametek asserts, in conclusory fashion, that, "[u]pon information and belief, Defendants have used and will continue to use such information to AMETEK's detriment." *Id.* ¶ 162; *see also id.* ¶ 95 (asserting, "upon information and belief," that AC MRO has already "used AMETEK's confidential, proprietary, and trade secret information"). But Ametek elsewhere acknowledges that this is not the case, alleging instead that "[AC MRO] is now *poised to use* the misappropriated information . . . to unfairly compete with AMETEK *in the immediate future*." *Id.* ¶ 89 (emphasis added); *accord id.* ¶ 81 ("Given Wood's question as to whether '*we*' will 'have this capability in the new shop,' [AC MRO] plainly *intends to use* this and other misappropriated information from AMETEK to gain an unfair advantage at its new facility and to do so in conjunction with Linares and Herrera." (second emphasis added)); *id.* ¶ 82 (alleging that information would "*enable* [AC MRO] to unfairly compete" (emphasis added)). Any such future use, of course, is purely speculative and cannot support Ametek's claims.

Moreover, Ametek's allegations regarding certifications do not cure this pleading

---

[9] Paragraph 86 of the Complaint is even more speculative, asserting: "Now that Rodriguez has these [AMETEK] documents in his possession, he could easily share them with his new employer—if he has not done so already—to give the latter yet another unfair advantage in competing with AMETEK." Such conjecture comes nowhere near plausibly pleading that AC MRO acquired trade secret documents from Rodriguez.

deficiency. Ametek alleges that AC MRO obtained aviation certifications (*id.* ¶ 87) and "purchase[d] supplies necessary to fully equip [its] Miami, Florida facility" (*id.* ¶ 88).[10] But Ametek pleads no facts indicating any connection between its trade secret information and the certifications and supply purchases alleged. Rather, Ametek has simply pleaded ordinary acts of competition: a new business obtaining equipment and certifications necessary to enter a marketplace.[11]

In short, Ametek has not plausibly alleged AC MRO's use of Ametek's purported trade secret information. Nor has Ametek plausibly alleged that AC MRO either "used improper means [itself] to acquire knowledge of the trade secret" information it allegedly used or, "at the time of . . . [the alleged] use, knew or had reason to know" the information had been so acquired by someone else. *See* 18 U.S.C. § 1839(5)(A), (B). Ametek has thus failed to state a claim for violation of the DTSA, and this court should dismiss Count VII as to AC MRO.

*Tortious interference (Count VIII)*

At the outset, Ametek's tortious interference claim is confusing and unintelligible, as it purports to be asserted against "All Defendants," and it lumps allegations of AC MRO's interference with Linares' agreements with Ametek as well as allegations of undefined "Defendants" interfering with the Individual Defendants' agreements. In addition, Ametek alleges "upon information and belief" that AC MRO was aware of the existence of the agreements, without any facts to support any such awareness. "Although information and belief pleading can sometimes survive a motion to dismiss where a plaintiff alleges specific facts to support a claim, conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the plausibility standard." *Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*, 522 F. Supp. 3d 1202, 1209 (S.D. Fla. 2021) (cleaned up). Count VIII is due to be dismissed for these reasons alone.

---

[10] Ametek alleges that, "on June 18, 2024, a new, for-profit corporation named 'AT4 Avionics Corporation' was registered with the State of Florida—with Herrera listed as its President, and Linares, Rodriguez, and another former AMETEK employee listed as its Vice Presidents." Compl. ¶ 90. Ametek does not allege that AC MRO was involved with this registration.

[11] As explained in AC MRO's response to Ametek's motion for a temporary restraining order, AC MRO has since made the business decision not to enter the MRO space. *See* [ECF No. 32] at 3-4; [ECF No. 32-1] ¶¶ 6-7.

### i.   The Complaint does not state a claim against the Individual Defendants for tortious interference

To state a claim for tortious interference with a contractual relationship against the Individual Defendants, Ametek must allege: (1) the existence of a contractual . . . relationship between the plaintiff and a third party; (2) purposeful action by the defendant, *specifically intended to harm* an existing relationship . . . ; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of defendant's conduct[.]" *Pac-West Distrib. NV LLC v. AFAB Indus. Servs., Inc.*, 674 F. Supp. 3d 132, 137 (E.D. Pa. 2023) (emphasis added); *see also Salsberg v. Mann*, 262 A.3d 1267, 1270 (Pa. Super. Ct. 2021) (same).

Ametek alleges in conclusory fashion that the Defendants' actions were "intentional, willful, and malicious," but there are no facts alleged to support any specific intent on the part of any of the Defendants to harm the relationships between the Individual Defendants and Ametek. As a result, the tortious interference claim against the Individual Defendants is subject to dismissal.

### ii.   The Complaint does not state a claim against AC MRO for tortious interference

Count VIII should also be dismissed as to AC MRO because Ametek has not plausibly alleged that AC MRO knew about any of the alleged contracts, nor that it intentionally procured breach of those contracts. "In Florida, the elements of a tortious interference with contractual relations are: (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional procurement of the contract's breach, (4) absence of any justification or privilege, and (5) damages resulting from the breach." *Monahan v. WHM, LLC*, No. 09-80198-CIV, 2010 WL 11504336, at *2 (S.D. Fla. Mar. 18, 2010) (cleaned up).

Ametek has alleged nothing to show that AC MRO knew of the existence or nature of any of the individual defendants' employment, severance, or non-compete agreements with Ametek. Instead, Ametek pleads only conclusory statements—unsupported by facts—asserting that AC MRO somehow knew about any such contractual obligations. *See* Compl. ¶ 94 (alleging without support that AC MRO was "fully aware that [Linares's] work for [it] violates the Agreements"); *id.* ¶ 166 (alleging, "upon information and belief," that AC MRO had "knowledge of Linares's obligations to AMETEK, including his obligations to not disclose AMETEK's confidential, proprietary, and trade secret information and to not compete against AMETEK"); *id.* ¶ 167 (alleging, "[u]pon information and belief," AC MRO's "knowledge of Linares's obligations and

the existence of the Agreements"); *id.* ¶ 168 (alleging that defendants were "aware of Herrera and Rodriguez's confidentiality obligations to AMETEK").

Plaintiff has further alleged no facts to show that AC MRO intentionally procured the alleged breaches of any of the individual defendants' employment, severance, or non-compete agreements with Ametek. Instead, as with its allegations of knowledge, Ametek pleads only conclusory statements, unsupported by facts detailing any specific actions by Ametek. *See* Compl. ¶ 97 (alleging Defendants' "clear intent to disregard Linares's post-employment obligations to AMETEK"); *id.* ¶ 166 (alleging without details that AC MRO "has interfered with and induced Linares to breach the terms of the Agreements"); *id.* ¶ 167 ("[AC MRO] continues to interfere with and induce Linares to breach the terms of his Agreements with AMETEK."); *id.* ¶ 168 (asserting that defendants "have induced and assisted in Herrera and Rodriguez's violations of the Confidentiality Agreements"); *id.* ¶ 170 ("Defendants' conduct in interfering with Linares, Herrera, and Rodriguez's existing contractual relations was and is willful, intentional, and unprivileged . . . ."). Count VIII fails for these two fundamental deficiencies and thus should be dismissed in addition as to AC MRO.

### *Breach of duty of loyalty claim (Count IX)*

To establish a breach of fiduciary duty, Ametek must allege that: "(1) the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which they were employed; (2) the plaintiff suffered injury; and (3) the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about the plaintiff's injuries." *Mallet & Co. v. Lacayo*, No. 19-1409, 2020 WL 6866386, at *4 (W.D. Pa. Nov. 23, 2020). But, "[a]n employee who takes steps to compete with his current employer prior to his termination does not automatically commit a breach of fiduciary duty[.]" *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 536 (W.D. Pa. 2018). Indeed, "an employee has a right to make preparations to go into a competing business even while he is still employed," as long he does not breach the "undivided duty of loyalty he owes his employer while still employed, by soliciting his employer's customers or other acts of secret competition." *Mallet*, 2020 WL 6866386, at *5.

As stated previously, Ametek fails to sufficiently allege the confidential or trade secret nature of the information purportedly shared with AC MRO. Moreover, Herrera and Rodriguez were not precluded by any agreement from competing with Ametek, or from preparing to work for a competing business after their terminations.

_Civil conspiracy claim_ (Count X)

Ametek's civil conspiracy claim against the Individual Defendants is barred by the intra-corporate conspiracy doctrine. "To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." _Thompson Coal Co. v. Pike Coal Co._, 412 A.2d 466, 472 (Pa. 1979). However, "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." _Rutherford v. Presbyterian-Univ. Hosp._, 612 A.2d 500, 508 (Pa. Super. Ct. 1992). Here, Ametek alleges that the Individual Defendants are employees of AC MRO, and taking that allegation as true, they cannot engage in a civil conspiracy as a matter of law.

Ametek's civil conspiracy claim is further subject to dismissal against all Defendants because the Complaint fails to state any viable underlying claims upon which a conspiracy claim could be based. Under both Florida and Pennsylvania law, civil conspiracy is not a standalone claim. _See Honig v. Kornfeld_, No. 18-80019-CV-MIDDLEBROOKS, 2019 WL 1509666, at *3 (S.D. Fla. Mar. 8, 2019) ("[a]n actionable conspiracy requires an actionable underlying tort or wrong," and "[a]n act which does not constitute a basis for a cause of action against one person cannot be made the basis for a civil action for conspiracy."); _Goldstein v. Phillip Morris, Inc._, 854 A.2d 585, 590 (Pa. Super. Ct. 2004) ("[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.").

As explained above, the claims against Defendants are insufficiently pled. Therefore, because "an act which does not constitute a basis for a cause of action against one person" cannot support a claim for conspiracy, Count X must fail.[12]

## V.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an order dismissing the Complaint for failure to state a claim, improper venue, and in favor of arbitration.

---

[12] Even if Counts VII and VIII, the only other claims alleged against AC MRO, were plausibly pleaded, Ametek's claim for civil conspiracy against AC MRO fails because Ametek has not plausibly alleged an overt act by AC MRO in pursuance of the alleged conspiracy.

Dated: August 5, 2024

Respectfully submitted,

| | |
|---|---|
| **BERGER SINGERMAN LLP** | **WINSTON & STRAWN LLP** |
| 1450 Brickell Avenue, Suite 1900 | Southeast Financial Center |
| Miami, FL 33131 | 200 S. Biscayne Blvd., 24th Floor |
| Telephone: 305-755-9500 | Miami, FL 33131 |
| | Tel.: (305) 910-0500 |
| */s/ Marianne Curtis* | */s/ Jared R. Kessler* |
| Marianne Curtis, Esq. | Jared R. Kessler, Esq. |
| Florida Bar No. 92729 | Florida Bar No. 96020 |
| mcurtis@bergersingerman.com | David A. Coulson, Esq. |
| mvega@bergersingerman.com | Florida Bar No. 176222 |
| Kenneth W. Waterway, Esq. | jrkessler@winston.com |
| Florida Bar No. 994235 | dcoulson@winston.com |
| kwaterway@bergersingerman.com | |
| Sabrina T. Zarco, Esq. | *Counsel for Defendant AVIATION* |
| Florida Bar No. 1025800 | *CONCEPTS MRO, LLC* |
| szarco@bergersingerman.com | |
| lmonteagudo@bergersingerman.com | |
| drt@bergersingerman.com | |

*Counsel for Defendants Ricardo Linares, Greta
Herrera, and Eduardo Rodriguez*

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on this 5th day of August, 2024, the foregoing has been transmitted by electronic filing with the Clerk of the Court via CM/ECF which will send notice of electronic filing to all counsel of record.

By: */s/ Marianne Curtis*
        Marianne Curtis